BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (SBN 077785)
aplutzik@bramsonplutzik.com
Jenelle Welling (SBN 209480)
jwelling@bramsonplutzik.com
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
925.945.0200 (telephone)
925.945.8792 (facsimile)

BAKER LAW PC
G. Richard Baker (SBN 224003)
richard@bakerlawpc.com
524 Union Street, #213
San Francisco, CA 94133
415.295.4814 (telephone)
800.886.6556 (facsimile)
richard@bakerlawpc.com

MIANO LAW PC
Bert J. Miano (SBN 218934)
bmiano@mianolaw.com
Post Office Box 59268
Birmingham, AL 35259
205.714.7199 (telephone)
205.714.7177 (facsimile)
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA TORRES, GABRIEL ROJAS, and IAN KERNER, individually and on behalf of all others similarly situated, , <br><br>                          Plaintiffs, <br><br>     v. <br><br> JC PENNEY CORPORATION, INC.; and JC PENNEY COMPANY, INC., , <br><br>                         Defendants. | Civil Action Case No. 12-01105-RS <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> <u>**JURY DEMAND**</u> |

## I.  INTRODUCTION

Plaintiffs, by and through undersigned counsel, bring this action individually and on behalf of all other Californians similarly situated against   Defendants J.C. Penney Corporation, Inc. and J.C. Penney Company, Inc. (collectively referred to hereinafter as "JCPenney").

1.     Plaintiffs allege that JCPenney fails to disclose the use of a surface coating that makes its white gold and sterling silver jewelry appear to be a bright, shiny white color, when the underlying metal actually has a much less desirable yellow, off-white or dingy grey color.  In addition to failing to disclose the altered appearance, JCPenney also fails to disclose that the coating will wear off, revealing the unexpected and undesired yellow, off-white, or dingy grey color of the underlying metals.  To retain the original shiny white appearance of the jewelry, consumers must pay out of pocket to re-coat it when the coating wears off.

2.     These undisclosed facts are material, in that they significantly affect the jewelry's value and marketability.  A reasonable consumer would have considered them to be important to his or her decision to purchase JCPenney's jewelry at all or to purchase it at the price at which was purchased.  Plaintiffs would not have purchased the jewelry they bought at the price at which they bought it or would not have purchased it at all, had they known that its appearance had been altered by a coating that would wear off, such that a re-coating would be necessary throughout their lifetime of ownership to retain the original, deceptive appearance.

## II.  PARTIES

3.     Plaintiff Maria Torres is a resident of Van Nuys, California.

4.     Plaintiff Gabriel Rojas is a resident of Corona, California.

5.     Plaintiff Ian Kerner is a resident of West Hollywood, California.

6.     JCPenney Company, Inc. is a foreign corporation with its principal executive offices in Plano, Texas.

7.     JCPenney Corporation, Inc. is a subsidiary of JCPenney Company, Inc., and also is headquartered in Plano, Texas.

### III.  JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

9.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and 29 U.S.C. § 1367.

10.     Venue is proper in the Northern District of California, San Francisco Division pursuant to Cal. Bus. & Prof. Code § 17203. In addition, JCPenney does business in this District, places its products into the stream of commerce in this District, and advertises in this District, such that a significant portion of the events and occurrences which form the basis of this lawsuit have occurred within this District.

### IV.  FACTUAL ALLEGATIONS

11.     The three precious metals, platinum, silver, and white gold, are all "white", but there are differences among them. Silver is the whitest of the precious metals and the most lustrous. It also is the least expensive.  The major drawbacks of silver are that it is softer and less durable than platinum and white gold, and that it tarnishes.

12.     Platinum, also white in color, is a much harder, denser material.  Though more difficult to fabricate due to its high melting point, it provides an ideal material for securely setting expensive stones.  However, it is far more costly.

13.     Falling between silver and platinum in price is gold, which is basically yellow in color.  White gold was developed in the 1920s as a substitute for the more expensive platinum. White gold is traditionally created by adding copper, nickel and zinc, all inexpensive alloys, to gold.  Varying the amount of these ingredients produces different shades of white, ranging from yellow to off-white.  An alternative recipe for producing white gold calls for alloying gold with copper, silver and palladium.  These alloys are more expensive than nickel and zinc, and they produce a whiter white.

14.     White gold is not necessarily more or less valuable than yellow gold.  However, jewelry made of white metal has been a strong fashion trend for more than a decade, so white gold

1   has become very popular and more desirable.  The term "white", however, actually encompasses a

2   wide range of colors.  A whiter white gold meets consumer desires for a bright, white precious

3   metal on its own.  Other color variants of white gold, such as those that appear more yellow, do not

4   satisfy the consumer desire for a bright, white precious metal, and, instead, are coated in rhodium

5   (which is itself a precious metal) to make the jewelry appear whiter than it is.  Rhodium is

6   generally not considered a feasible material from which to make jewelry because it is brittle and

7   very difficult to "work" properly for jewelry making.  Rhodium is favored for coating jewelry,

8   however, because it is very white and mirror-like, similar to chrome, but much whiter and more

9   reflective.

10          15.     In or around 2003, the World Gold Council and the Manufacturing Jewelers and

11   Suppliers of America ("MJSA") formed a White Gold Task Force.  Among other things, the Task

12   Force considered a problem known to the industry, but largely unknown to the public—consumer

13   complaints about the degradation of the white color of jewelry sold as "white gold" when the (often

14   undisclosed) rhodium coating of the jewelry begins to wear away, revealing an undesirable and

15   unrecognized yellow or off-white color.  The Task Force released the White Gold Whiteness Index,

16   which consists of seven unique white gold color chips, each corresponding to a value on the well-

17   established American Society for Testing and Materials ("ASTM") yellowness index.  By visually

18   assessing the color under standard daylight conditions, white gold can be categorized into three

19   grades: Grade 1, "good white" alloys measuring less than 19 on the ASTM yellowness index that

20   do not require rhodium coating; Grade 2, "reasonable white" alloys measuring between 19 and 24.5

21   on the ASTM yellowness index for which rhodium coating is optional; and Grade 3, "off-white"

22   alloys measuring between 24.5 and 32 on the ASTM yellowness index and requiring rhodium

23   coating. The Task Force also examined which alloy combinations tested Grade 1, Grade 2 and

24   Grade 3 so metallurgists could tweak alloy mixes to meet the desired grade.  The Task Force's

25   work and recommendations were well-known within the jewelry industry but were not generally

26   publicized by the press, nor were they disseminated to, or known by, the buying public.

27          16.     Through its participation in industry associations, as well as through its own

28   experiences selling precious metal jewelry, JCPenney was aware of the Task Force, its

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO.: 12-01105-RS
67829

4

1  recommendations, and the consumer dissatisfaction resulting from non-disclosure of rhodium

2  coating over jewelry described as "white gold."  The Whiteness Index was intended to help

3  jewelers, like JCPenney, explain to consumers the differences in "white" gold color and to

4  encourage jewelers to disclose that lower-grade, rhodium-coated white gold jewelry will likely

5  need recoating.  Of course, jewelers could opt to buy only premium grades of white gold to avoid

6  the uncomfortable scenario of disclosing the fact that their jewelry had a coating which looks

7  different from the underlying metal; the use of a less expensive white gold, which appears

8  yellowish in its natural state; and the additional, increased lifetime ownership costs due to the need

9  to re-coat the piece with rhodium.

10      17.      Daniel Ballard, national sales manager of Los Angeles based Precious Metals West

11  and member of the White Gold Task Force, explained that the Whiteness Index would "end the

12  guesswork of evaluating white gold" so consumer expectations can be satisfied since color is often

13  used to determine the value of jewelry.

14      18.      Consumers, nonetheless, are largely unaware of the variety of colors falling under

15  the rubric of "white gold" and expect that jewelry described as "white gold" gets its brilliant, white

16  look from the precious metal, and not from an undisclosed coating of rhodium.  In a recent survey

17  conducted by Harris Interactive at the request of the Jewelers Vigilance Committee, over half of

18  the respondents had *never* heard of rhodium, and an additional 25% had heard of it but said they

19  were not very familiar with it.  When told that applying a coating of rhodium was a common

20  procedure to enhance the white color of white gold jewelry, 76% of respondents felt that it was

21  extremely or very important to be informed that this procedure had been done.

22      19.      Because of the risk of deception and confusion caused by jewelry that is described

23  as "white gold" but is actually coated with an undisclosed amount of rhodium to achieve a bright,

24  white appearance, JCPenney, as a member of the Jewelers Vigilance Committee, recently

25  encouraged the Federal Trade Commission to include specific regulations covering white gold and

26  the use of rhodium.  The Jewelers Vigilance Committee is self-described as the industry's

27  "guardian of ethics and integrity."  On behalf of its members, including JCPenney, it urged the

28  FTC to declare that it is unfair or deceptive to "fail to disclose a surface-layer application of

precious metal [such as rhodium] on products quality stamped or described as 'white gold'." It further recommended that additional standards concerning the thickness of the coating be adopted to ensure consumers are not misled about the durability of the coating.

20.     Despite being well aware for at least a decade of consumer confusion and dissatisfaction with jewelry described as "white gold" only achieving the bright, white appearance through the undisclosed use rhodium coating, JCPenney fails to disclose that the jewelry it sells as "white gold" has been coated.  Because it does not disclose that fact, it *a fortiori* does not disclose that the coating will wear off, revealing a different-colored metal underneath; or that the jewelry will require re-coating during the customer's lifetime when the coating wears off, which impacts the true cost of owning the jewelry.

21.     Plaintiffs Torres and Rojas visited a JCPenney store together in Riverside, California, on or around November 2011 to select an engagement ring.

22.     JCPenney described the ring (Item #437-3830) as "14 karat white gold" with a diamond.  The ring appeared bright white and shiny, reaffirming JCPenney's representations that it was "white gold."

23.     JCPenney did not disclose that the ring was coated nor did it disclose that the coating would wear off. JCPenney did not disclose that the ring would require regular re-coatings. JCPenney did not provide any information as to the true color of the underlying metal.

24.     On information and belief, JCPenney routinely specifies to its vendors that its jewelry products, particularly those it later describes as "white gold," be coated with rhodium. Therefore, JCPenney knows that the jewelry has been coated.  JCPenney does not disclose on its website, in its advertisements, or in its retail stores that the jewelry it sells as "white gold" has been coated.

25.     JCPenney does not specify that its vendors must use Grade 1 white gold in the fine jewelry it sells. Rather, JCPenney simply negotiates an overall, quarterly fixed price for precious metals as a whole and leaves it up to the vendor to decide the color quality of the white gold used. In turn, vendors routinely use the least expensive recipe to generate white gold, which results in a true color that is yellowish.  JCPenney hides the true, undesirable yellowish color from consumers

by dictating that the piece be coated in rhodium, and then does not disclose the use of rhodium, deceiving consumers into believing that the observed color is the true color of the jewelry. JCPenney also affirmatively describes the precious metal color as "white."

26.     JCPenney represented that the regular retail price of the ring Plaintiff Rojas purchased was $8,999.99.   JCPenney sold it to him for a total of $1,070.98, after the application of discounts.  Plaintiff Rojas presented the ring as a gift to Plaintiff Torres. Neither of them knew the ring was coated with rhodium.

27.     Within a few months, the rhodium coating wore off to reveal a dull, yellow gold color of the underlying precious metal.

28.     Plaintiffs Rojas and Torres have had the ring re-coated more than once during the past year.

29.     Plaintiffs Rojas and Torres would not have purchased the ring at all or would not have paid the price they paid for it, had they known: (1) that it was coated with rhodium to make it appear bright white and shiny; (2) that the coating would wear off to reveal underlying metal of a different color, exposing an unattractive contrast between the rubbed-off coating and the dull, yellowish metal underneath; (3) that the jewelry would have to be regularly recoated to maintain its white, shiny appearance; or  (4) that they could incur additional expense over the lifetime of ownership to maintain the original bright white appearance of the jewelry.

30.     JCPenney also coats the sterling silver jewelry it sells with a thin layer of rhodium without disclosing the use of rhodium, that the rhodium will wear away, the lifetime costs necessary to maintain the original appearance, or the true color underlying the rhodium coating.

31.     JCPenney's failure to disclose the use of rhodium on the sterling silver jewelry it sells is substantially injurious to consumers because rhodium will not adhere directly to the sterling silver as it does to white gold.  Instead, an intermediate coating of either copper or nickel is necessary. Consequently, when the thin layer of rhodium wears away, an unexpected and undesirable copper or dull nickel color reveals itself, not the natural color of sterling silver. Moreover, unlike white gold pieces, due to the intermediate layer between sterling silver and the rhodium, rhodium-coated sterling silver cannot be re-coated easily.

32.     Plaintiff Kerner purchased a necklace (Item #FC058-2594), earrings (Item #FC058-8805) and bracelet (Item #FC058-0105) from JCPenney' website in January 2012, intending to give the items as gifts.  JCPenney described the items on its website as "sterling silver." JCPenney further described the jewelry pieces as: "Metal: Sterling silver" and "Metal color: White." The items appeared bright and shiny white.

33.     Although knowing the sterling silver items were coated in rhodium, JCPenney failed to disclose the use of rhodium in its advertising.  JCPenney failed to disclose that the rhodium would wear away, revealing a metal other than sterling silver (such as copper or nickel). JCPenney also failed to disclose any information about the maintenance required to maintain the bright, shiny appearance over the lifetime ownership of the jewelry.

34.     Plaintiff Kerner would not have purchased the jewelry items at all or would hot have paid the prices he paid, had he known: (1) that the jewelry was coated; (2) that the coating would wear off, revealing underlying metal of a different color; or (3) that the jewelry would have to be recoated to maintain its bright, shiny appearance.

35.     A comparison of JCPenney's internal jewelry specification sheets to JCPenney's advertising reveals that JCPenney specifies that its sterling silver jewelry be coated with rhodium. JCPenney, therefore, knows that the sterling silver jewelry is coated; knows that the coating will wear off, revealing different-colored metal underneath; knows that the jewelry will have to be recoated to maintain its bright, shiny appearance; and knows that recoating it may be problematic. JCPenney, nonetheless, affirmatively describes the color of the precious metals as "white" in advertisements, such as on its website, and in other written specifications, such as on the packaging and/or receipts provided at its retail stores.

36.     Through its experience selling fine jewelry, as well as through its memberships in various trade associations, JCPenney is and has been for at least a decade aware of the consumer desire for bright white, shiny jewelry. JCPenney also is aware that consumers rely on the color of jewelry, as well as written descriptions, to assess the value and desirability of jewelry.

37.     Through its experience buying and selling sterling silver jewelry, as well as through its memberships in various trade associations, JCPenney is aware that rhodium does not readily

1  adhere to sterling silver and that an intermediate metal, typically copper or nickel, is necessary.

2  JCPenney also is aware of the color differences between rhodium, copper, nickel, and silver.

3  Nonetheless, JCPenney does not disclose the use of rhodium to coat jewelry it describes as

4  "sterling silver", and also does not disclose that, when the rhodium wears away, the visible metal

5  color is something different from silver. Compounding the nondisclosure is JCPenney's affirmative

6  representation made on its website and in packaging and/or receipts that the metal color of its

7  sterling silver jewelry is "white."

8       38.  JCPenney misrepresents the rhodium-coated white gold and sterling silver jewelry it

9  sells ("the Jewelry") in two ways. First, JCPenney's visual aids, such as the products shown in

10  person and the pictures of its products on its website, misrepresent the Jewelry as bright, shiny

11  white, when the precious metals are not actually that color and only achieve that color through

12  undisclosed coating. Second, JCPenney's descriptions of the Jewelry as "white" misrepresent the

13  actual color of the metal underlying the undisclosed coating, which is the color the jewelry will

14  display when the coating wears off.

15       39.  JCPenney intentionally concealed and continues to conceal the following material

16  facts (the "Concealed Facts"):

17           a.  That the Jewelry is coated;

18           b.  That the coating will wear off;

19           c.  That the actual color of metal underlying the coating is different from the

20               color of the coating; and

21           d.  That the Jewelry will need to be re-coated throughout its lifetime to retain its

22               original appearance.

23       40.  The Concealed Facts were known to JCPenney at all relevant times.

24       41.  The Concealed Facts were not known to Plaintiffs and are not known to a

25  reasonable consumer. As demonstrated by the Harris poll, consumers are unaware of rhodium and

26  unaware of its use as a coating. Consumers also do not have access to JCPenney's internal

27  specification sheets.

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO.: 12-01105-RS
67829

9

42.     The Concealed Facts are material to Plaintiffs and would be material to a reasonable consumer. As indicated by the Harris poll, the vast majority of consumers would want to be told about the use of rhodium to coat their precious metal jewelry. In addition, consumers use color to assess the value of jewelry, particularly jewelry made of a precious metal.

43.     JCPenney has a duty to disclose the Concealed Facts for several reasons. First, JCPenney has a duty to disclose the Concealed Facts because the Concealed Facts are known to JCPenney but not known to, or discoverable by, consumers purchasing the Jewelry. *See, e.g., Nussbaum v. Weeks*, 214 Cal.App.3d 1589, 1600 (1989) ("seller has a general duty to disclose material facts that are not accessible to the buyer"), *citing* 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 700, at 801-02. Second, JCPenney has a duty to disclose the Concealed Facts to correct the misrepresentation of the Jewelry as "white". Describing the Jewelry as "white" is false, misleading, and likely to deceive reasonable consumers in the absence of disclosing the use of and implications flowing from the use of rhodium. *See, e.g.*, Restatement (Second) of Torts §§ 550, 551. Third, JCPenney has a duty to disclose the Concealed Facts to prevent harm to Plaintiffs and the Class. *See Bily v. Arthur Young & Co*., 3 Cal.4th 370, 397 (1992)(recognizing a duty to disclose based on "the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future hard."). Such a duty arises here because the Concealed Facts are integral to a transaction that was intended to affect Plaintiffs and the Class, the harm to Plaintiffs and the Class is foreseeable, and JCPenney's conduct is closely connected to the injuries suffered. Finally, the substantive statutory provisions under which Plaintiffs bring their claims impose on JCPenney a duty to not engage in deceptive business practices and to disclose all material information.

## V.  CLASS ACTION ALLEGATIONS

44.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit on behalf of themselves and a Class consisting of:

> All persons residing in the state of California who, during the four years preceding the filing of the original Complaint, purchased jewelry from JCPenney described as "white gold" and/or "sterling silver."

45.    Excluded from the Class are the employees, agents, officers and directors of JCPenney, and the Judge assigned to this matter.

46.    The Class comprises in excess of 10,000 consumers located throughout the State of California.  Joining all Class members would be impracticable due to their number and their geographic dispersion.

47.    Plaintiffs' claims are typical of the claims of the members of the Class.

48.    Plaintiffs will fairly and adequately protect the interests of the Class.  They have no conflicts of interest with the Class that would make them unfit to represent the class, and have retained counsel experienced in class action and complex litigation.

49.    Prosecution of individual actions by Class members would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for JCPenney. Moreover, JCPenney has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief appropriate.

50.    Questions of law and fact predominate over any questions affecting only individual members. Resolving Plaintiffs' claims on behalf of a Class of similarly situated individuals is superior to other methods of adjudicating this controversy. The interests of judicial economy are served by proceeding as a class, and the management of this action as a class action will not pose any difficulties.

51.    Some of the common questions presented, which will yield common answers for all class members include:

> a.  Whether JCPenney has a pattern and practice of coating the Jewelry without disclosing the Concealed Facts;

b. Whether the use of rhodium to coat the Jewelry is a material fact to a reasonable consumer;

c. Whether the fact that a coating will wear away is a material fact to a reasonable consumer;

d. Whether the true color of the metal underlying the rhodium coating is a material fact to a reasonable consumer;

e. Whether a color contrast between a coating and the underlying metal is a material fact to a reasonable consumer;

f. Whether the need to re-coat the Jewelry, and the attendant cost of doing so, is a material fact to a reasonable consumer; and

g. Whether JCPenney knew, or through the exercise of reasonable care should have known, that the undisclosed use of rhodium would be misleading given their descriptions of and the original appearance of the Jewelry.

## FIRST CAUSE OF ACTION

**(Violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.)**

52.     Plaintiffs incorporate and re-allege each and every above paragraph as if fully set forth herein.

53.     The policies, acts and practices described in this Complaint were intended to and did result in the sale of goods to the consuming public. JCPenney's acts and practices violate and continue to violate the CLRA in at least the following ways:

a. In violation of Civil Code Section 1770(a)(5), JCPenney represented that its goods have characteristics they do not have;

b. In violation of Civil Code Section 1770(a)(7), JCPenney represented that its goods are of a particular standard, grade, or quality, when they are of another; and

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO.: 12-01105-RS
67829

12

c. In violation of Civil Code Section 1770(a)(16), JCPenney represented that its goods were supplied in accordance with a previous representation when they were not.

54. JCPenney omits the true nature of the Jewelry in order to induce consumers into purchasing the Jewelry.

55. JCPenney suppresses the Concealed Facts.

56. JCPenney misrepresents the Jewelry by specifically stating "metal color: white" or other similar phrases, such as the phrase "white gold." The color of the metal underlying the rhodium coating is not white, but rather yellowish, dull grey or off-white. The misleading nature of JCPenney's affirmative descriptions of the precious metals as "white" is compounded by JCPenney providing pictures or in-person visuals of the Jewelry, which appear a bright, shiny and white.

57. Plaintiffs notified JCPenney in writing of the alleged violations on March 16, 2012, more than 30 days prior to filing this Second Amended Complaint. JCPenney did not provide the relief requested.

58. Because JCPenney failed to adequately respond to Plaintiffs' demand, Plaintiffs seek damages in accordance with the Act, including:

a. Restitution of all amounts paid by Plaintiffs and the Class for the Jewelry;

b. Disgorgement by JCPenney of all profits received in connection with the misrepresented jewelry;

c. Actual and consequential damages, such as the cost to re-coat the Jewelry; and

d. Punitive damages.

59. Plaintiffs seek an order enjoining JCPenney from selling the Jewelry without disclosing the Concealed Facts.

60. Plaintiffs also seek an award of attorneys' fees and costs pursuant to Section 1780(d).

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO.: 12-01105-RS
67829

13

## SECOND CAUSE OF ACTION

### (Violations of Business & Professions Code § 17200)

61.     Plaintiffs incorporate and re-allege each and every above paragraph as though fully set forth herein.

Unlawful Business Practices

62.     JCPenney's conduct, representations, and omissions constitute unlawful violations of the UCL.  JCPenney has violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a).  The FTC deems an advertisement deceptive where there is "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  California courts describe the Section 5 test as having three prongs: (1) whether the consumer injury is substantial; (2) whether the injury is outweighed by benefits to the consumer or to competition; and (3) whether consumers could themselves avoid the injury.  The focus is on whether the act or practice is likely to mislead, rather than whether it causes actual deception.

63.     The injury suffered by Plaintiffs and the members of the Class is substantial. They would not have purchased, or would have paid less for, the Jewelry had they known it had a coating which manipulated the appearance of the Jewelry and would wear off.

64.     There is no benefit to consumers or to competition in JCPenney's failure to disclose the Concealed Facts. There is no benefit to JCPenney affirmatively misrepresenting the color of the precious metal as "white" when, in the case of the white gold JCPenney uses, it actually is yellowish or, in the case of sterling silver, the white color will be obscured by a layer of different-colored metal such as copper or nickel.

65.     Neither Plaintiffs nor the Class members nor a reasonable consumer could themselves avoid the injury. The use of rhodium is not readily discernible by examination of the jewelry and consumers do not have access to testing equipment or the ability to test the jewelry to ascertain the metals prior to purchasing it. Consumers do not have access to JCPenney's internal specification sheets which reflect the use of rhodium.

66. JCPenney violates the unlawful prong of the UCL by virtue of its violations of the CLRA. Plaintiffs expressly incorporate their CLRA charging allegations herein.

67. JCPenney's description of the Jewelry as "white gold" or "sterling silver", as well as describing the "metal color" as "white," all without disclosing the use of rhodium, works a concealment of the true characteristics of the jewelry and conceals the undesirable contrast of colors that appear when the rhodium coating wears off.

Unfair Business Practices

68. For the same reasons that JCPenney's representations and omissions violate Section 5 of the FTC Act, they constitute violations of the "unfair" prong under the UCL. Thus, Plaintiffs expressly incorporate the allegations immediately above herein.

69. JCPenney's representations and omissions also constitute violations of the "unfair" prong because the harm from JCPenney's representations and omissions outweighs the utility of such conduct and such conduct offends public policy, is immoral, unscrupulous, unethical, deceitful, and offensive, and causes substantial injury to consumers.

70. Through statutes and regulations, such as Section 5 of the FTC Act, the UCL, and the CLRA, as well as through promulgation of the FTC Guides for Jewelry, Precious Metals, and Pewter Industries (16 C.F.R 23), the state and federal executive and legislative bodies have expressed a public policy to prevent consumer confusion and consumer deception in the sale of fine jewelry. JCPenney's conduct violates the spirit of the public policies reflected in these promulgations.

71. JCPenney is obligated to disclose its use of rhodium to coat the Jewelry because it is a material fact to consumers, as the recent Harris Interactive poll confirms. Rhodium conceals the true color of the underlying metals and deceives consumers into believing they are buying a truly lustrous, white precious metal that is naturally bright white. As the rhodium wears away, an undesirable and unattractive contrast between the remaining shiny rhodium and the metal underneath is revealed.

72. By presenting the bright, shiny jewelry itself, and by describing the Jewelry as "white gold" or "sterling silver", as well as describing the "metal color" as "white", but applying a

thin layer of rhodium to change the appearance of the jewelry, JCPenney makes representations without disclosing facts which materially qualify the representations, rendering its non-disclosures likely to mislead.

73. JCPenney is aware of consumer preferences for bright, shiny white precious metal jewelry, and JCPenney also aspires to stay within a particular price point for jewelry. Accordingly, JCPenney actively conceals the relevant facts concerning rhodium plating from Plaintiffs and consumers.

<u>Fraudulent Business Practices</u>

74. JCPenney's representations and omissions constitute violations of the "fraudulent" prong of the UCL. JCPenney's description of the Jewelry as "white gold" or "sterling silver" without disclosing the Concealed Facts is misleading, and is likely to mislead a reasonable consumer. JCPenney's descriptions, such as on its website, of the "metal color" of sterling silver and white gold jewelry as "white" is false. The observed metal color when the rhodium wears away is yellowish or off-white or dingy grey.

75. JCPenney's advertisements of the Jewelry in catalogs, in stores, and via the Internet during the past four years were intended to and did reach consumers. These advertisements were deceptive because the appearance of the Jewelry was manipulated such that the bright, shiny white appearance did not come from the stated precious metals, but rather from use of a coating that would rub off. Plaintiffs and consumers rely on the descriptions of the Jewelry as "white gold" or "sterling silver" and seek out these highly desired precious metals and are deceived when the Jewelry later changes to reveal an undesirable, cheap-looking two tone piece.

76. WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## **THIRD CAUSE OF ACTION**

**(Violations of Business & Professions Code § 17500 *et seq.*)**

77. Plaintiffs incorporate and re-allege each and every above paragraph as if fully set forth herein.

78. JCPenney engaged in misleading and deceptive advertising in violation of the False Advertising Law ("FAL").

79.     JCPenney, through complaints from prior purchasers of the Jewelry about unexpected altered appearances after wearing the jewelry, as well as through their participation in industry trade associations, such as the Jewelers Vigilance Committee ("JVC"), knew, or in the exercise of reasonable care should have known, that advertising jewelry as "white gold" or "sterling silver", describing the precious metal color as "white", and/or displaying images and providing in-person products that appear bright, shiny white,  while not disclosing the Concealed Facts was misleading.

80.     In fact, recently, the JVC, on behalf of its members, including JCPenney, encouraged the FTC to specifically declare it to be unfair and deceptive to fail to disclose the outer application of rhodium on products quality stamped or described as "white gold". JCPenney's Senior Vice President of fine jewelry and watches, Ms. Mortensen, was on the Board of Directors of JVC while the JVC researched and prepared its submission to the FTC. JCPenney was a member of the JVC and participated in, as well as reviewed, the FTC's prior discussions of consumer expectations regarding gold, in the context of coatings, in 1996.

81.     Plaintiffs and the Class have been harmed by Defendants' aforesaid violations of the FAL.

82.     Plaintiffs and the Class are entitled to an order of this Court enjoining future wrongful conduct, and such other orders which may be necessary to restore to any person in interest any money paid as a result of JCPenney's misleading advertisements.

83.     WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## VI.  PRAYER FOR RELIEF

84.     WHEREFORE, Plaintiffs pray for relief, for themselves and for the Class, as set forth below:

       a.   An order certifying that the action be maintained as a class action, and that the Plaintiffs and their counsel are adequate to represent the Class;

       b.   For a preliminary and permanent injunction enjoining JCPenney from advertising, representing, or otherwise holding out for sale within the State

1   of California, any jewelry described as "white gold" and/or "sterling silver"

2   without prominently and clearly disclosing the Concealed Facts;

3   c.   An order requiring JCPenney to provide corrective notice to fully inform its

4   past purchasers of the Concealed Facts'

5   d.   An order requiring JCPenney to provide re-coating services free of charge to

6   Class members;

7   e.   For a judgment of the Court, pursuant to Business & Professions Code §§

8   17200 et seq. and 17500 et seq., to restore to any person in interest any

9   money acquired by means of JCPenney's unlawful, unfair, fraudulent, and/or

10   deceptive acts, practices, representations and omissions;

11   f.   Disgorgement of the excessive and ill-gotten monies obtained by JCPenney

12   as a result of the misleading advertising described herein;

13   g.   Actual damages and punitive damages pursuant to the CLRA;

14   h.   An award of attorneys' fees, costs, including expert expenses;

15   i.   Pre- and post-judgment interest; and

16   j.   Such other and further relief as this Court deems necessary or proper.

17   ## JURY DEMAND

18   For all causes of action, where it is available, Plaintiffs hereby demand a trial by jury.

19   Dated:  December 21, 2012            BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP

20   _____
        s/ Jenelle Welling

21   Jenelle Welling
     Alan R. Plutzik (SBN 077785)

22   aplutzik@bramsonplutzik.com
     Jenelle Welling, (SBN 209480)

23   jwelling@bramsonplutzik.com
     2125 Oak Grove Road, Suite 120

24   Walnut Creek, California  94598
     Telephone: (925) 945-0200

25   Facsimile: (925) 945-8792

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT                                    18
CASE NO.: 12-01105-RS
67829

1

2                    BAKER LAW PC
                   G. Richard Baker (SBN 224003)

3                    richard@bakerlawpc.com
                   524 Union Street, #213

4                    San Francisco, CA  94133
                   415.295.4814 (telephone)

5                    800.886.6556 (facsimile)
                   richard@bakerlawpc.com

6

7                    MIANO LAW PC
                   Bert J. Miano (SBN 218934)

8                    bmiano@mianolaw.com
                   Post Office Box 59268

9                    Birmingham, AL 35259
                   205.714.7199 (telephone)

10                   205.714.7177 (facsimile)

11                    Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28